Estate of Murphy v New York City Hous. Auth. (2021 NY Slip Op 02246)





Estate of Murphy v New York City Hous. Auth.


2021 NY Slip Op 02246


Decided on April 13, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 13, 2021

Before: Kapnick, J.P., Webber, Mazzarelli, Oing, JJ. 


Index No. 158442/12 Appeal No. 13183 Case No. 2020-01722 

[*1]The Estate of Tayshana Murphy by its Administratrix, Tephanie Holston, Plaintiff-Appellant,
v
The New York City Housing Authority, Defendant-Respondent, Tyshawn Brockington et al., Defendants. [And a Third-Party Action]


Pecoraro & Schiesel LLP, New York (Steven Pecoraro of counsel), for appellant.



Order, Supreme Court, New York County (Robert D. Kalish, J.), entered on or about July 17, 2019, which granted defendant New York City Housing Authority's (NYCHA) motion for summary judgment dismissing the complaint as against it, unanimously affirmed, without costs.
Early in the morning of September 11, 2011, Tayshana Murphy (Murphy), the daughter of plaintiff Tephanie Holston (Holston), was murdered by defendants Robert Cartagena and Tyshawn Brockington inside the Grant Houses, a NYCHA residential housing development, in Manhattan. The homicide was the tragic culmination of a street fight that arose between members of rival gangs. Cartagena and Brockington belonged to "Make it Happen Boys," which was based at the Manhattanville Houses in upper Manhattan. Murphy's brother was a member of the "Three Stacks," based at the neighboring Grant Houses, and Murphy was a close friend of other members of the gang.
In the afternoon of the day before the murder, groups from the Grant and Manhattanville Houses fought in front of the C-Town Supermarket on 125th Street, and they threw glass bottles at each other. At around 1:30 a.m. on September 11, some people from the Grant Houses learned that a Three Stacks member had been assaulted by a Make it Happen Boys member. Murphy went to Manhattanville, with her brother and others from the Grant Houses who were members of the Three Stacks, to fight. At around that time, Cartagena and his girlfriend, Brittany Santiago, were on their way back to their apartment when they were confronted and chased by the group from the Grant Houses. The Grant Houses group threw bottles at Cartagena, punched him, knocked him down, and kicked him.
When Cartagena and Santiago met Brockington later, Brockington complained that he "almost got jumped" by Grant House members. Cartagena then called Terique Collins, an acquaintance of his. Cartagena, Santiago, Brockington and Collins arranged to meet up, at which time Collins gave Brockington a gun that he and Cartagena had purchased together. Santiago testified that Cartagena and Brockington were upset and said that they were "going to go smoke somebody." Soon thereafter, Cartagena and Brockington approached the same group that "almost jumped" him, in front of Murphy's building at the Grant Houses. The group fled, believing that Cartagena and Brockington were armed, and ran into the building. After fleeing up the stairs, Murphy and two members of the group she had been with stopped at the fourth floor. Her companions each went to investigate whether anyone from the other group was coming in their direction. Each heard Murphy say something to somebody about how she was not involved in the previous altercation, and then heard gunshots. Another friend, who was in the elevator at the time, also heard the shots. When he got to Murphy's apartment, he looked out the kitchen window and saw Cartagena and Brockington on the street, walking in the direction of the Manhattanville Houses. Murphy had [*2]been shot three times.
Holston commenced this action asserting causes of action against Cartagena, Brockington, Collins, the City and NYCHA. As concerns NYCHA, the complaint asserts that it was negligent in failing to have properly functioning locks at the premises, to properly monitor surveillance equipment, and to provide adequate security. NYCHA moved for summary judgment. In support of its motion, NYCHA relied on the evidence submitted by the People of the State of New York at the criminal trial of Cartagena, which resulted in his conviction on, inter alia, second-degree murder charges and sentencing to a term of 25 years to life in prison.[FN1] The People had elicited the testimony of several of the people who had been involved in the fighting that night and argued to the jury that Murphy was killed in an act of vengeance for the actions of Three Stacks members and that she was targeted for that purpose.
NYCHA also submitted an affidavit by a security management consultant. He averred that NYCHA's maintenance staff performed routine inspections of all doors to make sure that they were locking properly and that daily caretaker checklists for September 10, 2011 (the day before the murder) and September 12, 2011 (the day after the murder) both indicated that building entrance and exit doors were locking properly. In any event, he opined that no security device would have deterred committed individuals like Brockington and Cartagena, considering that they were not deterred by people standing in front of the building who could have identified them later to police or by the presence of security cameras in the lobby of the building, given that they took no steps to cover their faces from being videotaped. The consultant surmised that even if the front entrance door was locked when Brockington and Cartagena attempted to enter the building, they would have waited outside for someone to exit the door and then gone inside, or they would have used the intercom system to get someone to open the door for them or some other method to gain access. The consultant also relied on CompStat data, which suggested that the murder rate in the precinct where the Grant Houses are situated was low compared to other New York City precincts, making her murder unforeseeable.
In opposition, Holston submitted a flash drive containing the surveillance footage that was recorded on the morning of the murder in and about the building where she lived and where her daughter was killed. The surveillance footage shows, in the immediate timeframe of Murphy and her assailants entering the building through the side door, a few people apparently unrelated to the rival factions sitting in a park directly outside the building and one person who also seems to have no connection to the feud approaching the building holding what looks like keys and entering the building through the front door. Murphy and several members of her group run into the building's lobby. They linger for a brief moment [*3]in the lobby, then flee when they apparently see Cartagena and Brockington approaching. Cartagena and Brockington are seen approaching the building and heading for the door through which the person with the keys had entered a few seconds earlier, and then, apparently finding it locked, heading for the unlocked side door. The lobby camera shows that the side door is propped open as Murphy and the others in her group run inside and that they pull it closed behind them. One of the group opens the door as the group looks for Cartagena and Brockington, but when the group flees up the stairs, the door is allowed to close on its own, and it bounces open and shut upon reaching the door frame. The door similarly bounces open and shut behind Cartagena and Brockington after they walk through it.
Holston also submitted an affidavit in which she stated that the side door through which her daughter's killers entered the building was supposed to be for egress only, since there was no handle on the outside of the door, and no keyhole, and since there was a button on the inside wall immediately to the right of the door that unlocked the door when pushed. However, she stated that, during her entire residency in the building the door was never locked, and anyone could exit it by pushing the door open from the inside, without the need of pushing the button first. Also, people would commonly enter the building through the door by pulling on the door's window grate. Holston further averred that she had reviewed the surveillance videos and that they show how the door typically functioned at the time and how people typically entered through it from the outside — by grabbing the window grate and pulling the door open. She confirmed that during the two days before Holston's murder the door was not locked and that the videos showed the way it was operating during those two days. She stated that she regularly complained about the side door, both by telephone and in person at the management office, but that she never saw the door being repaired, or even examined.
Plaintiff also submitted an affidavit by a trained and licensed locksmith who examined the surveillance footage, photos and NYCHA work orders, and the door itself. He opined that the electromagnetic door lock was not working as intended, based on the surveillance video's showing the door bouncing as it hits the jamb. The consultant stated that the video evidence flatly contradicted NYCHA's caretaker checklists stating that the locks were in working condition on the day of the incident. He also reviewed two work orders from several months before the incident, the first identifying problems with the locking mechanism of the door in question and the second reflecting remedial work that was performed, but concluded that the second work order did not establish that the problems noted in the first were actually addressed.
Supreme Court granted NYCHA's motion, holding that Murphy was the "target of a preplanned attack," [*4]which, even if NYCHA had notice of a defective condition (namely a door with a malfunctioning locking mechanism), was "an unforeseeable superseding intervening cause, which, in effect, would negate the effect of [such] notice." The court stated that it felt "constrained" by Roldan v New York City Hous. Auth. (171 AD3d 418, 419 [1st Dept 2019]), also a broken lock case, in which this Court stated that "the plaintiff admitted that he was the victim of a targeted attack by the alleged assailant, which severed the causal nexus between NYCHA's alleged negligence and [the] plaintiff's injuries." The court further held that NYCHA established that the side door was working properly at the time of Murphy's murder and that plaintiff failed to raise an issue of fact in opposition, although that ruling was academic in light of the court's ruling on the "targeted victim" defense.
NYCHA was not an insurer of Murphy's safety, but it did have "a common-law duty to take minimal security precautions to protect tenants . . . from the foreseeable criminal acts of third parties" (Wayburn v Madison Land Ltd. Partnership, 282 AD2d 301, 303 [1st Dept 2001]). NYCHA's principal argument is not that it took minimal precautions, but that Cartagena and Brockington were sufficiently intent on vengeance that any precautions it took would have been futile. In so arguing, NYCHA relies on Roldan (171 AD3d 418) and several other cases from this Court. In Roldan, which also involved a broken lock in a NYCHA building, this Court dismissed the complaint on the basis that the plaintiff could not establish that the assailant was an unauthorized intruder, as opposed to an invited guest. However, it also noted that the causal connection between any negligence by NYCHA and the plaintiff's injuries was severed by the plaintiff's admission that he was the victim of a targeted attack. This Court in Roldan cited cases such as Buckeridge v Broadie (5 AD3d 298 [1st Dept 2004]) and Rivera v New York City Hous. Auth. (239 AD2d 114 [1st Dept 1997]). In those cases the perpetrators of the crime against the plaintiff carried out a preplanned attack that demonstrated their determination to succeed notwithstanding any minimal security precautions placed in their way.
The Second Department recently characterized our precedent in the area of negligent security cases where there was a targeted victim as drawing a "sharp distinction between targeted and random attacks in determining issues of foreseeability and proximate cause" (Scurry v New York City Hous. Auth., 193 AD3d 1, 9 [2d Dept 2021]). It called this approach problematic, since "the binary dichotomy between those two categories of crime . . . mechanically focus[es] on the perpetrator's intent, [and] fails to account for the myriad of facts that may be present in a given case. Indeed, there may be more than one proximate cause of an occurrence or injury." The Scurry Court goes on to state that a court's focus in such cases should be on the various [*5]contributing factors to the crime, including whether a faulty lock presented the assailants with "an opportunity to attack the decedent, in a manner that might not otherwise have been possible" (id. at 10).
We disagree with the Scurry Court's implication that under this Court's jurisprudence the fact that a victim was targeted obviates the need for any inquiry into the security measures in place at the subject premises. Indeed, we are aware of no case in the First Department that suggests that a landowner would avoid liability even if minimal precautions would have actually prevented a determined assailant from gaining access. In reality, however, that is hardly ever the case. In Buckeridge v Broadie (5 AD3d 298, 300), cited in Roldan, the assailants were "sophisticated" and disguised themselves to gain entry. In Cerda v 2962 Decatur Ave. Owners Corp. (306 AD2d 169, 170 [1st Dept 2003]), also relied on by Roldan, the plaintiff was assaulted by a "team of assassins." Roldan itself does not discuss the circumstances by which the plaintiff was targeted or the level of planning by the assailant, but the supporting cases confirm that this Court has not abandoned the notion that more than the simple fact that a victim was targeted is necessary to shield a property owner from liability. Rather, the cases confirm that, given the minimal steps a landowner is required to take to secure premises, it has no duty to outwit or outthink those who are determined to overcome those steps.
The record establishes that Murphy's killers were intent on gaining access to the building. Cartagena and Brockington arranged to meet Collins, who had a gun, and testimony and text messages revealed that they were bent on revenge. This is further evidenced by the brazen manner in which they entered the building, in plain sight of several other people and surveillance cameras, without attempting to shield their faces. Moreover, considering that at least one other person, by all appearances oblivious to the brouhaha between the two groups, entered the building at the same time, it does not take a leap of the imagination to surmise that Cartagena and Brockington would have gained access to the building by following another person in or forcing such a person to let them in. This negates the unlocked door as a proximate cause of the harm that befell Murphy, and makes her assailants' murderous intent the only proximate cause.
In view of the foregoing, plaintiff's arguments about notice are academic. THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT. 
ENTERED: April 13, 2021



Footnotes

Footnote 1: Collins was acquitted of all charges, but Brockington was convicted of second-degree murder, first-degree burglary, and two counts of second-degree criminal possession of a weapon, and sentenced to an aggregate term of 25 years to life.